NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0137n.06

Case Nos. 20-5035/5037

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ISMAEL GONZALEZ; JOLIE JOHNSON,

      Defendants-Appellants.

**FILED**
Mar 15, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

BEFORE:    SUHRHEINRICH, CLAY, and DONALD, Circuit Judges.

**CLAY, Circuit Judge.**  Defendants Ismael Gonzalez and Jolie Johnson appeal their

convictions for conspiracy to possess with intent to distribute heroin, methamphetamine, and

cocaine in violation of 21 U.S.C. § 841(a)(1), and conspiracy to launder monetary instruments in

violation of 18 U.S.C. § 1956.  Specifically, Defendants appeal the district court's decision to deny

their motions to suppress wiretap evidence.  Additionally, Defendant Johnson appeals the district

court's decision to deny her a *Franks* hearing, and Defendant Gonzalez appeals the district court's

decision to deny his Fourth Amendment challenge of a searched vehicle.  For the reasons set forth

below, we affirm.

**I.  BACKGROUND**

**A.  Factual History**

    On October 21, 2015, government agents seized drugs after raiding a home in Kentucky.

The owner of the home informed agents that he bought the drugs from a drug dealer named Yamil

Estrada.  The following year, the United States Drug Enforcement Administration (DEA) and the

Louisville, Kentucky Police Department began an investigation into a large-scale drug conspiracy occurring in the Louisville area. The investigation culminated in the convictions of several defendants, including Yamil Estrada, Ishmael Gonzalez, and Jolie Johnson, who were arrested after federal agents seized thirty-one kilograms of cocaine and six kilograms of heroin. The convictions of Defendants Ishmael Gonzalez and Jolie Johnson were partly based on a series of wiretaps used in connection with an investigation of Defendant Estrada. The legality of those wiretaps is central to this appeal.

### i. Estrada Wiretap

The investigation of Yamil Estrada in Louisville led agents to believe that Estrada was a heroin, cocaine, and methamphetamine dealer who had sources in Mexico. As a result, on March 2, 2016, government agents sought a wiretap of Estrada's phone to further their investigation of him. In the wiretap application, the government expressed how traditional investigative techniques typically employed by agents would not suffice in achieving the DEA's investigative goals hence the need for the wiretap. In an attached affidavit, DEA agent Brian Sanders stated that the investigation had failed to conclusively identify all the co-conspirators, alternate sources of supply, couriers, distributors, customers, or the full nature and scope of the criminal operation.

An undercover agent was able to pose as a courier and successfully purchase heroin from Estrada but was unable to provide information about Estrada's methods of purchasing and transporting large shipments of heroin, cocaine, and methamphetamine. Additionally, agents had no direct knowledge of how Estrada laundered the proceeds of his drug operation. Sanders was of the view that agents would not be able to watch Estrada gather with other conspirators for meetings and that surveillance would be insufficient to prove the purpose of the meetings. Toll records showed Estrada conversing with a suspected supplier in Mexico, but those records did not show

the substance of the conversations. Subsequently, the district court granted the wiretap. At this point in the investigation, neither Ismael Gonzalez nor Jolie Johnson were known to be participants in the alleged conspiracy.

After the district court approved the initial wiretap, Estrada began using a new phone. This caused the government to apply for a second wiretap, which the district court granted. This subsequent wiretap intercepted Estrada arranging drug deals with Ricardo Ruiz. Ruiz had been the subject of former investigations since 2014 and DEA agents now believed that Ruiz and Estrada were using the same supplier.

### ii. Ruiz Wiretap

On April 6, 2016, the government sought a wiretap of Ruiz's phone after phone calls between Ruiz and Estrada showed Ruiz's involvement in the drug operation. This wiretap application, similar to the application for the Estrada wiretap, relied on Agent Brian Sanders' affidavit. Shortly after the district court granted the wiretap, the government intercepted calls from Ruiz that showed him calling Gonzalez with information about the drug conspiracy. In 2015, a confidential source had mentioned that Gonzalez was involved in drug operations, but up until this point, Gonzalez had never been under investigation. As agents listened to Ruiz's phone calls, the agents heard Ruiz requesting a pound of methamphetamine from Gonzalez. Gonzalez responded that Ruiz could find the methamphetamine for $6500 per pound at a specific location. Hours later, agents tracked Ruiz in route to purchase the drugs but lost him in traffic. Despite losing sight of Ruiz, a wiretapped call intercepted Ruiz informing Gonzalez that he had found the drug package. The next day, Gonzalez and Ruiz met in person and the agents tracked their whereabouts. Agents discovered that Gonzalez drove a silver Chevrolet Impala. That information was then used to petition a state court for geo-location data from Gonzalez's phone.

### iii.    Gonzalez Wiretap

On May 3, 2016, a little less than two weeks after the first intercepted call between Ruiz and Gonzalez, agents petitioned the district court for another wiretap, but this time on Gonzalez's phone. They relied once again on a new affidavit from agent Brian Sanders in the wiretap application. The wiretap was granted by the district court. Agents proceeded to wiretap Gonzalez's phone and overheard his conversations with Dante Watts and Jolie Johnson, who prior to this point, had not been persons of interest in the investigation. In a particular phone call, Gonzalez asked Jolie Johnson to accompany him in delivering methamphetamine to Dante Watts.

On July 1, 2016, an intercepted conversation showed Gonzalez making plans to receive a shipment of drugs from a supplier, who would deliver the drugs on a truck. On July 2, 2016, government agents followed the truck until it parked at a body shop. The agents then moved in with search warrants and discovered cocaine, crack cocaine, and heroin in the vehicle. Agents immediately arrested those present at the scene, and agents arrested Gonzalez later that day. Several days later, agents arrested Jolie Johnson for her involvement.

## B. Procedural History

On July 6, 2016, Defendants Jolie Johnson and Ismael Gonzalez were indicted for conspiracy to possess with intent to distribute heroin, methamphetamine, and cocaine, alongside other members of the conspiracy. A subsequent indictment with money laundering charges was handed down on June 27, 2017. Johnson filed a motion to suppress in the district court, arguing that the government's wiretap of Gonzalez was illegal because the government had not exhausted normal investigative methods before applying for the wiretap. Several co-defendants, including Gonzalez, joined the motion to suppress. Gonzalez then moved to expand the motion to suppress to include the Ruiz wiretap. After the government opposed the motion, Johnson claimed the

4

wiretap had omitted a material fact that Gonzalez had already been the target in another investigation. The district denied the motion to suppress without an evidentiary hearing on October 27, 2017, ruling that the wiretaps satisfied the necessity doctrine and that Johnson lacked standing to contest the Gonzalez wiretap.

A few days later, Johnson filed a motion for reconsideration, arguing that she in fact had standing to contest the Gonzalez wiretap. The government did not contest that Johnson had standing. The district court reversed its initial conclusion and ruled that Johnson had standing to contest the wiretap. After this ruling, however, the court denied Johnson's motion for reconsideration and reasserted that the wiretap affidavits met the necessity requirement. The district court additionally concluded that Johnson failed to satisfy her burden for an evidentiary *Franks* hearing.

Separately, Gonzalez then filed a motion to suppress evidence seized from the truck that led to his arrest. The magistrate judge presiding over the motion ruled that a further objection to the search had to be made within fourteen days. Gonzalez did not file an objection, and when the district court adopted the magistrate's recommendation to deny the motion, the court noted that Gonzalez had waived the issue. And even on the merits, the district court concluded that Gonzalez did not have a privacy interest in the truck, and he therefore lacked standing to contest the search.

After the district court denied these motions, Defendants Gonzalez and Johnson pleaded guilty to the conspiracy to possess with intent to distribute heroin, methamphetamine, and cocaine. Johnson was sentenced to sixty-six months imprisonment. Gonzalez was sentenced to one hundred eighty-four months imprisonment. As part of their plea agreements, both Defendants reserved the right to appeal their motions to suppress. This appeal followed.

## II. DISCUSSION

### A. The Necessity of the Wiretap

### 1. Standard of Review

After a district court denies a motion to suppress, we review "the factual findings for clear error and the legal conclusions de novo." *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). A factual finding is "clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *United States v. Shank*, 543 F.3d 309, 312 (6th Cir. 2008). This Court accords "great deference" to the district court's necessity determinations regarding wiretap applications. *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (quoting *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988)); *see also United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (issuing judge's decision on necessity requirement afforded "considerable discretion"). As a result, "the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Alfano*, 838 F.2d at 162.

### 2. Relevant Legal Principles

Under the necessity doctrine, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The necessity requirement does "not foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but [serves] simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977). Instead, the doctrine protects against wiretaps becoming an "initial step in [a] criminal investigation." *United States v. Rice*, 478 F.3d

6

704, 710 (6th Cir. 2007). The government must show they gave "serious consideration to the non-wiretap techniques prior to applying for wiretap authority." *Id.* "[A] purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be . . . inadequate compliance with the statute." *Id.* (quoting *Landmesser*, 553 F.2d at 20). However, the "prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried." *Id.*

### 3. The Wiretap Application Satisfied the Necessity Requirement

The district court correctly concluded that the wiretap application met the necessity requirement. Agent Brian Sanders wrote affidavits that detailed the government's investigative steps, and why the wiretap was necessary. In the wiretap application, Agent Sanders detailed why "conventional techniques" had failed prior to applying for the wiretap. *Landmesser*, 553 F.2d at 20. Defendant Gonzalez became a subject of the investigation after intercepted phone calls from Ricardo Ruiz implicated Gonzalez's involvement in the conspiracy. Those intercepted calls did not provide information about Gonzalez's drug source. Prior to applying for a wiretap of Gonzalez's phone, the agents attempted to use other avenues to procure more information. On April 21, 2016, agents surveilled Gonzalez to track his whereabouts, but lost him in traffic after a U-turn. As part of that surveillance, agents drove by a home where an informant said Gonzalez lived, but they never found Gonzalez there. The informant only had limited information about Gonzalez. Sanders believed that introducing a new informant was unlikely to yield further results in the investigation, because in his experience as an agent, drug operations typically compartmentalized members from each other to prevent anyone from knowing too much.

Agents took further steps to investigate, including subpoenaing Gonzalez's phone toll records to find out whom he was calling. But those records only provided phone numbers, rather

than the substance of the conversations. Agents then geo-tagged Gonzalez's phone to track his whereabouts, but once again, it did not provide information regarding who he was meeting. Agent Sanders also described in his affidavit why, in his professional experience, other techniques were unlikely to be successful. A search warrant would be unsuccessful because the agents did not know where Gonzalez stashed drugs or where he lived. Even if agents could find Gonzalez's home, agents did not want to alert other members of the conspiracy of the investigation. Other techniques like placing a tracking device on Gonzalez's car were considered dangerous because it risked agents being discovered while placing the tracking device.

The investigative techniques agents documented in their application demonstrate how the wiretaps were not used as the "initial step in the criminal investigation." *Rice*, 478 F.3d at 710. Rather, the application described how "other investigative techniques have been tried and failed or why they reasonably appear[ed] to be unlikely to succeed or be too dangerous." 18 U.S.C. § 2518(1)(c). Further, to have the wiretap approved, agents were not required to "prove that every other conceivable method has been tried and failed . . . [or] exhausted." *Rice*, 478 F.3d at 710. In Defendants' briefs, they assert that agents had sufficient evidence prior to the wiretap application to render the application unnecessary. But the agents intended to understand the fullest extent of the conspiracy and every member who was involved, and they were entitled to pursue further leads. *See United States v. Young*, 847 F.3d 328, 345 (6th Cir. 2017) (rejecting defendant's argument that when agents obtain evidence prior to a wiretap application, the wiretap application should be rendered unnecessary). Thus, given the "great deference" provided to the district court after a wiretap is approved, our review shows sufficient necessity for the wiretap application. *Corrado*, 227 F.3d at 539. We conclude that the wiretap application was correctly approved after the government demonstrated sufficient necessity to further the objectives of their investigation.

###### B. Defendant Johnson's Petition for a *Franks* Hearing

###### 1. Relevant Legal Principles

We review a "district court's denial of a *Franks* hearing under the same standard as for the denial of a motion to suppress: the district court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo." *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001). The Fourth Amendment provides that where a defendant can make a substantial showing that an affiant in an affidavit for a search warrant lied, the defendant is entitled to a hearing to discard the fruits of the warrant. *See Franks v. Delaware*, 438 U.S. 154 (1978). To qualify for a *Franks* hearing, a defendant must show that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56. "[N]o hearing is required" when the "material that is subject of the alleged falsity or reckless disregard is set to one side [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Id.* at 171-72. Material omissions made in an affidavit may qualify a defendant for a *Franks* hearing, but this Court has "recognized that an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *Graham*, 275 F.3d at 506. A defendant may be granted a *Franks* hearing for a material omission "only if: (1) the defendant makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit" in addition to "(2) a finding [that] probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008).

## 2. Defendant Johnson Was Not Entitled to a *Franks* Hearing

The district court properly denied Defendant Jolie Johnson an evidentiary *Franks* hearing. Johnson argues that Agent Brian Sanders made a material omission in his wiretap affidavit detailing the investigation of Gonzalez. When federal agents filed a wiretap application in the Western District of Kentucky, Gonzalez had already been indicted after a separate investigation in the Eastern District of Kentucky. The wiretap application stated that agents were working on an investigation in the Eastern District of Kentucky alongside the agents in the Western District but did not reference the Gonzalez indictment specifically. Because agents did not include this information about the indictment, Defendant Jolie Johnson argues that the omission was material enough to warrant a *Franks* hearing. Further, Johnson argues it had direct implications on the necessity of, and probable cause for, the wiretap. Despite Johnson's assertions, the record shows that Gonzalez was charged in the Eastern District for crimes he committed years earlier than those in the current investigation by agents in the Western District. At the time of the wiretap application, agents believed new information would further the Western District investigation because they were investigating Gonzalez for crimes separate from those in the Eastern District.

Before the wiretap application, agents were unable to discover the details necessary to uncover the full extent of the drug conspiracy. Indeed, agents in the Western District knew very little about Gonzalez's whereabouts and involvement in the conspiracy, even after their coordination with the Eastern District. But even with such little information, "[t]here remain[ed] sufficient content in the warrant affidavit to support a finding of probable cause." *Franks*, 438 U.S. at 171-72. Upon review, we find the omission to be minor in nature rather than a "deliberate falsehood or reckless disregard for the truth." *Fowler*, 535 F.3d at 415. Accordingly, since agents did not intentionally mislead the court, and sufficient probable cause remained in the wiretap

application, Defendant Johnson was not entitled to a *Franks* hearing. *See Franks*, 438 U.S. at 171–72.

### C. Standing in Connection with the Search of the Seized Vehicle

#### 1. Relevant Legal Principles

We review "the trial judge's findings of fact regarding the defendants' standing to challenge alleged Fourth Amendment violations . . . for clear error, while the legal determination of standing is reviewed *de novo*." *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008). Under the Fourth Amendment, "a defendant has standing to challenge the admission of evidence only if the defendant's own constitutional rights have been violated." *Id.* That determination centers largely on whether the "defendant can establish 'a legitimate expectation' of privacy in the area searched or the items seized." *United States v. Davis*, 430 F.3d 345, 359–60 (6th Cir. 2005) (quoting *Minnesota v. Carter*, 525 U.S. 83, 91 (1998)). A defendant has the "burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). The expectation of privacy is shown when a defendant has a "possessory [or] property interest" in the relevant item searched or seized. *Davis*, 430 F.3d at 360. We will also review other factors to determine whether a defendant had an expectation of privacy, including:

"[O]wnership, possession, and/or control; historical use of the property searched or the things seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy, and the objective reasonableness of such an expectancy under the facts of a given case."

*United States v. Smith*, 263 F.3d 571, 584 (6th Cir. 2001).

#### 2. Defendant Gonzalez Lacks Standing to Contest the Search of the Vehicle

When federal agents searched the truck on July 2, 2016, a co-defendant in the conspiracy, Oscar Argueta, was driving the vehicle where federal agents found cocaine and heroin inside.

Gonzalez was not a passenger in the vehicle, and he was arrested later that day in a different location. On appeal, Gonzalez argues an intercepted call made on July 1, 2016 demonstrated his ownership of the truck. In that call, a man says, "Once I turn [the truck] in[,] [there will be a] guarantee that the title is clean from you." (ECF No. 281 at PageID # 1775.) Gonzalez then replied, "[w]hat's mine is mine. It's mine. It's under my name . . . the trailer and boat have a title and the truck." (*Id.*)

As an initial matter, Defendant Gonzalez lacks standing to contest the search of the truck because he waived his right to appeal the district court's ruling on this issue. At first, Gonzalez filed a motion to suppress the evidence found in the truck, but after his initial motion, the presiding magistrate judge ordered the parties to file a further objection within a fourteen-day period. Gonzalez never filed that objection, and the district court subsequently considered his lack of objection to be a waiver of the issue. In light of this ruling, Gonzalez waived the issue on appeal. *See United States. v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding a defendant's failure to object to a magistrate judge's report constitutes a waiver of his right to appeal the admission of evidence).

Further, even on the merits, Gonzalez carried the "burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched," but he failed to provide sufficient proof to satisfy that requirement. *Talley*, 275 F.3d at 563. Gonzalez has offered no other evidence to establish his ownership of the truck nor was he able to clarify or corroborate whether the truck discussed in the phone call is the same as the one co-defendant Argueta was driving the day agents searched it. A records search demonstrated that the truck was registered to Argueta, and Gonzalez's name was not on the title. Since another person held physical possession and legal title to the truck, Gonzalez's "own constitutional rights [were not] violated." *Mastromatteo*,

538 F.3d at 544. Thus, because Gonzalez is unable to show "ownership, possession, and/or control" over the vehicle in question, we find that he did not have standing to contest the search of the truck. *Smith*, 263 F.3d at 584.

### III. CONCLUSION

For the reasons set forth above, we affirm.